IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.  21cr307-2 |
| | ) | |
| PAUL H. VON BERNEWITZ | ) | |

## DEFENDANT'S POSITION ON SENTENCING

Paul Von Bernewitz is a good guy who sometimes gets caught up in the moment. Paul is very close to his brother, sister, and mother. This recent photograph shows them together, with Paul on the far right.



Paul and Eric are so close that Paul moved from Florida to Virginia Beach to be closer to his brother and his brother's family. PSR ¶ 55. Perhaps because Paul does not have children of his own, he goes above and beyond as an uncle. For example, Paul volunteers as a coach for his nephews' wrestling team. *Id*. Paul would do almost

anything for his brother. In the early morning hours of January 6, 2021, Paul decided at the last minute to accompany his brother to the Trump rally in Washington, DC.

Paul did not learn about the rally on social media or from some right-wing website. He did not attend as a member of any organization or group. Paul barely has Facebook and struggles to use his cell phone correctly. No, Paul learned about the rally from his bother. In his voluntary interview with the FBI, Paul explained to agents that when his brother asked him to join, he agreed by saying "Yeah, I'll go with you, whatever." Interview, at 37:00-37:23. Paul told the FBI that his brother and sister are both much more political than he is. Paul's 'yeah-whatever' acceptance of his little brother's invitation reflects Paul's mindset going into the rally. He was not a radical activist on a mission to interfere with government operations. He was a big brother tagging along to be a good sport.

The government's video and forensic evidence bears this out.

As the Court is aware by now, video from January 6th shows some members of the crowd wearing militia-style clothing and carrying real or make-shift weapons (bats, pitchforks, etc.). Others brought signs, megaphones, or flags. Even the least prepared folks donned Trump-embossed clothing – hats, scarves, sweatshirts. Paul had none of this. He carried no sign, waved no flag, and bore no weapon. He wore everyday attire: slacks with a dark jacket and an NYPD baseball cap.

From very early on, Paul was forthright about what he did that day. On January 21, 2021, he met voluntarily with his lawyer at the time and FBI agents. Paul admitted to entering the Capitol with his brother. He consented to a search of

his cellphone, which the agents conducted that same day. And after receiving court-appointed counsel, Paul pleaded guilty and accepted responsibility for his actions. Paul wrote, "I regret everything that I did that day …. I support and respect the police …. I was even wearing my NYPD hat that day. My actions did not show my respect for the police or the rules. I am sorry and I will never do anything like this again." PSR ¶ 24.

Paul is not a radical threat to democracy. He sometimes gets carried away in the moment, like when he and his brother were involved in a fight in a Georgia sports bar. PSR ¶ 29. And Paul is the first to admit that he got carried away with the crowd on January 6th. He should not have been on the Capitol grounds, and he should not have been inside the Capitol Building for 14 minutes. But he did not touch a police officer, he did not damage any property, and he did not attempt to take anything from the building.

The letters of support submitted with this filing describe a well-intentioned, working-class family man. He has struggled with alcohol, and he has a history of acting impulsively. But the record is devoid of any suggestion that Paul was trying to overthrow the government on January 6th. His poor judgment in the moment led to this prosecution and conviction. But the absence of any malicious intent to interfere with democracy makes a sentence of three days' imprisonment sufficient to satisfy the objectives of sentencing set out in 18 U.S.C. § 3553(a).

## I.    The seriousness of the offense does not require extended incarceration

Not everyone who entered the Capitol on January 6th engaged in equally culpable conduct. In assessing the relative gravity of Paul's offense, we ask the Court to consider four important factors.

*First*, Paul's offense did not involve premeditation. As noted above, this offense involved literally no planning. Paul did not plan to enter the Capitol. Paul did not even plan to attend the rally. Those who engaged in preplanned conduct aimed at influencing the proceedings at the Capitol – even people whose conduct was limited to inciting others – are significantly more blameworthy than someone like Paul who followed a crowd and got carried away. In his interview with the FBI, Paul described the scene as having the feel of a rock concert. It seems quite likely that Paul would have acted the same way on January 6th if he was part of a crowd at a ballpark, rock concert or political rally. His conduct was impulsive, irresponsible, and inexcusable. But it was not thoughtfully directed at achieving some political goal.

*Second*, Paul did not assault a member of law enforcement, destroy property, or encourage anyone else to do so. The government may stress in its filing that Paul was "pushing" in the crowd. The FBI asked Paul about that in his interview and Paul acknowledged pushing in the crowd but explained that the pushing and jostling was "not in a bad manner." He said it was "like being in a [ ] rock concert. Everybody's pushing you; it wasn't like, nobody was like, nobody was like getting mad at each other or anything like that…." Interview at 3:25-3:32. The government will be able to show that Paul extended his arm and had his hand on the back of the person in front

of him in the crowd on the steps. But Paul did not push up directly against any police line or barricade. And that this pushing at the bottom of some stairs outside the Capitol Building is the most aggravating conduct to which the government can point.

Paul and his brother eventually followed the crowd up the stairs toward the door of the Capitol building. Notably, whatever "pushing" occurred at the bottom of the stairs did not continue.[1] And it is noteworthy that the Probation Office essentially agrees with the defense's perspective on this point, writing that "Paul Von Bernewitz's culpability appears to be minimal in contrast with rioters who destroyed or stole government property and assaulted or threatened the law enforcement officers on that date." ECF No. 49, at 1.

*Third*, Paul entered the Capitol non-violently: he walked through a set of doors being held open by two members of the Capitol Police.

---

[1] It may be worth noting that it does not appear that the government is bringing criminal charges for being present on the stairs, as conservative radio host Alex Jones appears to be present on the stairs in question in this video footage provided by the government.



In assessing the nature of Paul's entry into the building, it is critical to recognize that Paul entered one person in front of the defendant in *United States v. Martin*, No. 1:21cr394 (D.D.C. Apr. 6, 2022). Martin was charged in this Court with multiple offenses, including 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. But he was found *not guilty* at trial. *Id.*

According to public reporting about the trial, this Court made the following findings in *Martin*: "At the time the defendant was on the scene, officers were standing beside the doors to let people pass," a reference to the Columbus Doors at the top of the east Capitol steps where Paul Von Bernewitz and Martin entered. Ex. 1, at 2 (highlighted section). This Court continued: "People were streaming in and the officers made no attempt to stop people at the door … *I do find the defendant reasonably believed the officers allowed him into the Capitol.*" *Id.* (emphasis added).

The screenshots below were taken from the video recorded by Martin himself. This photo shows the Von Bernewitz brothers as seen by Martin's camera outside the Capitol building before entry. Paul is marked with a green arrow, Eric with yellow.



A short while after the screenshot above, Martin and the Von Bernewitz brothers entered the Capitol at essentially the same moment. The photo below shows Paul Von Bernewitz – as seen by Martin's camera – entering the Capitol. Paul is marked with green arrow. The door – which an officer appears to be holding open – is on the right edge of the photo. The officer can be seen standing in the open doorway.

Other footage shows that another member of the Capitol police was on the other side

of the doorway, to Paul's left, in essentially the same position.



To be clear, Paul is not claiming innocence or moving to withdraw his plea. Nor

is the defense suggesting that this entry into the Capitol should be excused. But it is

no doubt mitigating here that this Court found in another case that the circumstances

of Martin's entry were such that he should be acquitted of all charges. The need to

treat similarly situated people similarly is an interest underlying several of the

sentencing factors. *See, e.g.*, § 3553(a)(1) ("nature and circumstances of the offense");

§ 3553(a)(2)(A) (need for sentence "to reflect the seriousness of the offense");

§ 3553(a)(6) (addressing "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). Here, Paul is very similarly situated to Martin, who was found not guilty. When criminal conduct is – by this Court's own judgment – quite close to the line that separates innocence from guilt, courts should hesitate to impose highly punitive sentences like extended incarceration.

Even if the Court does not find the comparison to *Martin* compelling, Paul's entry was still less aggravating than in many other cases. Some people broke glass, climbed through windows, or forced their way through doors. For example, in *United States v. Ivey*, the defendant "was one of the very first rioters to enter the U.S. Capitol and he did so by climbing through a window that he had just watched be smashed with a two-by-four and a riot shield." ECF No. 34, at 14 in *Ivey*, No. 1:21cr267 (D.D.C. Feb. 1, 2022). Mr. Ivey's entry was far more aggravating than Paul's, yet this Court imposed home detention as a condition of probation with no active period of incarceration. Similarly, this Court imposed probation in *United States v. Doyle*, 21-cr-324 (D.D.C. Oct. 5, 2021), even though the defendant entered through a broken window at approximately 2:23PM and stayed in the Capitol building for at least 24 minutes. *See* ECF No. 27, at 8, in *Doyle*. A period of extended incarceration here would create an unwarranted disparity between Paul and the defendants in *Ivey* and *Doyle*.

*Finally*, Paul did not stay in the building for very long and did not venture outside of the Rotunda. Paul was in the Capitol Building for a total of 14 minutes (from 3:03PM to 3:17PM).

This CCTV footage shows that Eric entered first.



Then Paul entered just behind Eric at two seconds before 3:03PM:



As noted in Statement of Offense, Paul "left the Rotunda voluntarily," but the brothers had to "wait[ ] to exit as the crowd slowly out of the US Capitol." PSR ¶ 19.

This screengrab below shows that Paul left the Rotunda at 3:14PM, about eleven minutes after entering the building.



Paul and his brother exited the building just before 3:17PM.



The government's sentencing request in this case is out of step with both the sentences imposed in other cases and its own recommendation in other cases. For example, in *United States v. Lolos*, No. 21-cr-243, the defendant entered through a broken window at the Senate Wing Door. *See* ECF 32, in *Lolos*. Lolos stayed in the Capitol for 43 minutes while chanting at U.S. Capitol police and left only after being

confronted by officers. *Id.* He was captured on video yelling "They left! We did it!"; he

sent text messages proclaiming that he was "storming the Capitol"; and he texted a

photo of himself with the caption "[m]e after the battle." *Id.* Finally, Lolos had a prior

conviction for threatening to kill someone. *Id.* The government requested one month

of incarceration – somehow seeking less than it is recommending here – and Lolos

was sentenced to 14 days' incarceration.

Another example is *United States v. Lori Vinson*, No. 21cr355. According to

the government, rioters first breached the Senate Wing Door area at 2:13PM and Lori

Vincent was among the first people inside within five minutes of that breach. ECF

No. 43, at 3-4 in *Vinson.* This was over an hour before Paul and Eric Von Bernewitz

entered.

Then the government describes how Lori Vinson pushed to the front of a crowd

inside the Capitol Building and led a standoff with a police line that had formed to

stop the internal advance. This is from page 6 of the government's sentencing memo:



*Id.* at 6. The government explains that Lori Vinson was also part of the crowd that pushed police back down an interior corridor in the Capitol, and that she watched as members of a crowd pushed open the Rotunda doors from the inside. *Id.* at 7-8.

The aggravating factors in *Vinson* continued after Lori Vinson left the Capitol Building. "In direct messages after January 6, 2021, she told multiple people she would 'do it again.'" *Id.* at 9. Then in a television interview aired on January 13, 2021, Lori Vinson said, "I felt like what I had done was justified, and so I just said I would do this all over again tomorrow, I'm sorry that you don't see my worth." *Id.* at 10. During a television interview on January 14, Lori Vinson said, "People have asked are you sorry that you done that, absolutely I am not, I am not sorry for that, I would do it again tomorrow," and that "I felt like I've done nothing wrong and I wouldn't change it." *Id.* at 11. Yet the government recommended 30 days' imprisonment, less than it is recommending here. *Id.* at 1. And the Court imposed home detention.

The defendants in Lolos and Vinson engaged in more aggravating conduct at the Capitol (entering through a broken window and pushing back police lines inside the building); their motivations were more political; and their post-offense conduct demonstrated pride and indignance rather than remorse. Yet the government recommended lower sentences in both cases. Unless the government can meaningfully distinguish those cases, the Court should discount the government's recommendation for a 45-day prison sentence in this case.

## II.    Paul's actions on January 6 were out of character

In addition to the information in the Presentence Report, the defense asks the Court to consider several character letters attached to this filing. These letters

describe Paul as generous and kind. *See, e.g.*, Letter from Kevin McDearmid (describing Paul as "a kind hearted individual" who "volunteers his time to his community").

Paul's landlord describes Paul as "[m]y best tenant." *See* Letter from Ken Capps. The landlord recalls that – because he is getting on in age and had a bad accident – Paul helped him make some repairs to the trailer recently. But when the landlord offered to pay Paul for his help, Paul would not take any money. *Id.*

Paul opens his doors to people in need. One of Paul's friends notes that "any time a hurricane threatens South Florida, Paul lets me evacuate to his home, as I have done on at least four occassions." *See* Letter from Deasy Anderson.

Paul's current supervisor at work describes him as "a very loyal, dedicated and honest person." *See* Letter from Holly Simpson. Another work colleague praises Paul as "one of the hardest working team members I have." *See* Letter from Yvonne Lipsky. She notes that she is "thankful to have him in my life." *Id.*

Paul lives a humble life but, by all accounts, he warms the lives of the people around him.

### III.   Paul demonstrated early and credible acceptance of responsibility

On January 21, 2021 – about two weeks after the events at the Capitol – Paul Von Bernewitz voluntarily sat down with FBI agents and answered their questions. He also consented to a search of his phone. Paul admitted to entering the Capitol. He was not sure how long he had been inside but estimated it be could have been for less than ten minutes but not more than twenty minutes. As corroborated by evidence

obtained later by the government, that estimate was accurate. Paul had been inside 14 minutes. Obviously, Paul did not have to speak with agents. Yet he did so and was generally honest.

Another important consideration is that Paul did not brag online or to friends about his involvement in the events of January 6th. He did not celebrate his role or make claims about other people being responsible. He did not hold himself out as a hero on television or social media. In other words, Paul's actions after January 6th were entirely consistent with his acceptance of responsibility in this Court.

In these ways, Paul's post-offense conduct is significantly more mitigating than that of others appearing in this Court.

For example, "When initially contacted by FBI and asked whether she entered the Capitol on January 6, [Defendant] Sizer falsely stated that she did not enter the Capitol building." ECF No. 26, at 6 in *United States v. Sizer*, No. 1:21-cr-621 (D.D.C. Jan. 25, 2022). In fact, Sizer did enter the Capitol Building after someone pried open the Parliamentarian Door with a crowbar. *Id.* at 4. She later pleaded guilty to the same parading offense at issue here, and this Court imposed no incarceration.

The case of *United States v. Wilkerson* is another example. No. 1:21cr302 (D.D.C. Nov. 17, 2021). "After leaving the Capitol Building, Wilkerson posted a video to the social media platform Snapchat in which he bragged about having been inside the Capitol." ECF No. 23, at 7 in *Wilkerson*. Later in the day on January 6, 2021, Wilkerson posted another video in which he stated, "today was a good day, we got inside the Capitol." *Id.* at 8. More troublingly, on January 10th Wilkerson wrote in a

Facebook message, "I will be at every patriot rally on the east coast until this is over and it has just begun. This evil machine must be burned to the ground!!!!" *Id*. Wilkerson sent another disturbing message on January 13th indicating his hope for a military coup. *Id*. Yet Wilkerson was sentenced to probation only.

Paul's early meeting with the FBI in which he admitted to his presence inside the Capitol and the absence of any statements bragging about his involvement in this offense lend credibility to the statements he made to Probation. He does regret his involvement in the events of January 6th.

## IV.   Lengthening Paul's sentence will not generate greater deterrence

In this case, the defense is asking for three days of imprisonment. But even a fully non-custodial sentence would be sufficient to achieve deterrence. As to specific deterrence, the evidence shows that sending people to prison does not effectively deter them from future offending. "In fact, some studies show the rate of recidivism among offenders sentenced to imprisonment to be *higher* [than those not sent to prison]."[2] Specifically, one study showed that "being incarcerated versus remaining in the community was associated with a seven percent increase in recidivism."[3] This is not

---

[2] Mirko Bagaric, *et al.*, *A Principled Strategy for Addressing the Incarceration Crisis: Redefining Excessive Imprisonment As A Human Rights Abuse*, 38 Cardozo L. Rev. 1663, 1719 n.268 (2017) (emphasis added); *see also* Cassia Spohn, *Deterrent Effect of Imprisonment and Offenders' Stakes in Conformity*, 18 Crim. Just. Policy Rev. 31, 31 (2007).

[3] Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, The Sentencing Project, at 7-8 (Nov. 2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf (last accessed Apr. 18, 2022).

merely a selective reading of a few studies. A 2016 report of the Executive Office of the United States President reviewed the relevant research and concluded that "a growing body of work has found that incarceration increases recidivism."[4]

As to general deterrence, research indicates that it is not the *severity* of punishment but the *certainty* of it that drives general deterrence.[5] In 2016, even the Department of Justice confessed in its publication on deterrence that "[i]ncreasing the severity of punishment does little to deter crime," acknowledging that "[l]aws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective."[6]

Because "studies repeatedly show that awareness of potentially severe sanctions does not produce less crime,"[7] general deterrence "does not require a particularly burdensome penalty, merely one that people would seek to avoid," which "could be satisfied by a fine."[8] In sum, neither specific nor general deterrence interests would be promoted by a period of extended incarceration. The "truism" in

---

[4] White House Council Of Econ. Advisors, Exec. Office Of The President, *Economic Perspectives On Incarceration And The Criminal Justice System*, at 39 (2016), *available at* https://obamawhitehouse.archives.gov/sites/whitehouse.gov/files/documents/CEA%2BCriminal%2BJustice%2BReport.pdf (last visited Apr. 18 2022).

[5] Wright, *Deterrence in Criminal Justice*, at 1.

[6] U.S. Dept. of Justice, *National Institute of Justice Five Things About Deterrence* (May 2016), *available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf (last accessed Apr. 18, 2022).

[7] Mirko Bagaric, *A Rational Theory of Mitigation and Aggravation in Sentencing: Why Less Is More When It Comes to Punishing Criminals*, 62 Buff. L. Rev. 1159, 1202-03 (2014) (footnotes omitted).

[8] *Id.* at 1205.

sentencing that longer sentences deter better is based on an intuition that is unsupported by empirical studies.

## V.    A so-called "split sentence" is not authorized by statute

The government recently advised defense counsel that it would be seeking what the government refers to as a "split sentence," *i.e.*, a sentence that includes *both* a term of imprisonment *and* a term of probation. Such a sentence is not authorized by law.

Appended as Exhibit 2 to this filing is an amicus brief filed by the Federal Public Defender in *United States v. Caplinger*, No. 1:21cr342 (D.D.C. Feb. 23, 2022). The analysis in that brief applies here. Both Paul and the defendant in *Caplinger* were charged with petty offenses under 40 U.S.C. § 5104. Caplinger was charged under § 5104(d) and Paul under § 5104(e)(2)(G). But because the maximum authorized sentences for violations of both § 5104(d) and § 5104(e)(2)(G), is six months or less of imprisonment, 40 U.S.C. § 5109(b), both are classified as Class B misdemeanors, 18 U.S.C. § 3559(a)(7), and petty offenses, 18 U.S.C. § 19. Thus, the analysis is the same.

We ask the Court to consider the arguments in Exhibit 2 and incorporate them here. But, in short, the relevant statutes authorize a term of imprisonment *or* a term of probation, not both. *See* 18 U.S.C. § 3551(b). Thus, the government's requested

sentence – which includes both probation and imprisonment – would exceed that authorized by law.[9]

## VI.   Paul should be permitted to self-surrender for service of his sentence

Paul has been on bond for over a year. He has been working and – if sentenced to imprisonment – would benefit from having the ability to coordinate his absence with his employer. The government has advised the defense that it does not intend to ask for Paul to be remanded into custody at sentencing. Probation also agrees that Paul is a good candidate for voluntary surrender. ECF No. 49, at 3. The defense respectfully asks the Court to consider allowing voluntary surrender if Paul is sentenced to imprisonment.

We also respectfully ask the Court to recommend that any sentence of imprisonment be served at FCI Petersburg.[10]

* * *

Paul Von Bernewitz wrongfully entered the Capitol. His actions in that hour or so were inexcusable. But his wrongful actions were limited to that hour, the last 14 minutes of which were spent in the Capitol. He did not plan or prepare before then to engage in any wrongful behavior. And since he walked out of the Capitol that day, he has done virtually everything right. He interviewed with the FBI, voluntarily

---

[9] For that reason, such a sentence would fall outside the appeal waiver in the plea agreement.

[10] FCI Petersburg is a low security federal correctional institution with an adjacent minimum security satellite camp located in Hopewell, Virginia. *See* BOP.gov, FCI PETERSBURG LOW, *available at* https://www.bop.gov/locations/institutions/pet/ (last accessed Apr. 19, 2022).

consented to a search of his phone, pleaded guilty, and credibly expressed his remorse and regret. In such circumstances, a sentence of three days imprisonment is sufficient under § 3553(a).

Respectfully submitted,

PAUL VON BERNEWITZ

By:_____/s/_____

Andrew W. Grindrod
Virginia Bar No. 83943
Office of the Federal Public Defender
Eastern District of Virginia
150 Boush Street, Suite 403
Norfolk, Virginia 23510
(757) 457-0860 (direct)
(757) 457-0880 (fax)
andrew_grindrod@fd.org